FIRST ILLINOIS BANK OF WILMETTE, as Trustee, *et al.*, Plaintiffs-Appellees, v. WALTER B. VALENTINE, Richmond Township Road Commissioner, Defendant-Appellant (May Development Company *et al.*, Defendants).

Second District   No. 2—92—0816

Opinion filed September 1, 1993.

Michael C. Poper and Stephen M. Haugh, both of Michael C. Poper, P.C., of Crystal Lake, for appellant.

Daniel A. Mengeling, of Johnson, Leahy & Mengeling, Ltd., of Woodstock, and Phyllis J. Perko, of Harlovic & Perko, of West Dundee, for appellees.

JUSTICE COLWELL delivered the opinion of the court:

Plaintiffs, First Illinois Bank of Wilmette (First Illinois) and Nippersink Properties, Inc. (Nippersink), sued Richmond Township road commissioner Walter Valentine, May Development Company, and any unknown owners to quiet title to property that First Illinois alleged it owned as trustee of a land trust of which Nippersink is the sole beneficiary. The property in controversy is the unimproved part of a roadway within the Canterbury Heights subdivision of Richmond Township (the township). The issue at trial was whether this property, known as the Hillandale Road extension, was the subject of either a valid statutory dedication by May Development or a valid common-law dedication from Arnold May, the original owner of the land, to the township. The trial court held that (1) the attempted statutory dedication was invalid because May Development did not own the property that became the Hillandale Road extension when it made the formal plat of dedication; and (2) there was no common-law dedication because the township's conduct between the filing of the plat and the present suit amounted to a failure to accept any dedication intended either by Arnold May, who owned the land at the time of the attempted statutory dedication, or by May Development, Arnold May's successor.

On appeal, Valentine (defendant) argues that the court erred in holding that there was no common-law dedication of the Hillandale Road extension. Defendant maintains that the trial court's finding that the township did not accept the dedication was against the manifest weight of the evidence. Defendant also argues that equitable doctrines required the trial court to find that the Hillandale Road extension is subject to a common-law dedication. We affirm the trial court.

Plaintiffs' amended complaint, filed February 13, 1992, alleged the following. Pursuant to a land trust agreement dated July 20, 1988, First Illinois, as trustee for Nippersink, held fee simple title to land in the sixth addition of the Canterbury Heights development. Accompanying the complaint as an exhibit was a legal description of this property. Plaintiffs had taken active possession of the premises and had started to build a single-family residence thereon.

Plaintiffs alleged that defendant and the township unlawfully claimed the right to use part of the property, *viz.*, the Hillandale Road extension, as a public road. This asserted right was based on a plat of dedication recorded with the county recorder of deeds on August 10, 1979, and rerecorded on October 22, 1979. The plat, attached to the complaint as an exhibit, is signed by defendant and by Robert May, president of May Development. Hillandale Road runs in an arc, starting out northwesterly from Hillshire Drive, which is along the west edge of the fourth addition of Canterbury Heights; Hillandale turns sharply until it proceeds in a south-southwesterly line along the western edge of the fourth addition. The curve creates a cul-de-sac, where plaintiffs have started their building.

According to the complaint, the statutory dedication attempted via the plat was fatally defective because May Development did not own the land it purportedly dedicated to the township. Also, for the 13 years between the recording of the plat and the start of the present suit, the subject "road" had remained a farm field; it had not been accepted, improved, or used by the public as a roadway. After this suit began, plaintiff improved 125 feet of Hillandale roadway pursuant to a court order. This road provided access to the residence.

Plaintiffs asserted that the recorded plat of dedication and defendants' assertion of rights thereunder were a cloud on plaintiffs' title to the property. They requested that any attempted dedication of the Hillandale Road extension be revoked so First Illinois would have clear title to the property.

Defendant's answer admitted that the subject property had been a farm field for the last 13 years and that the intended roadway had not been improved before this litigation started. However, Valentine

denied that the township had failed to accept the dedication of the Hillandale Road extension.

The case proceeded to a bench trial. Plaintiffs' first witness was Fred Zahn, a land surveyor who, at Robert May's request, prepared a map of the area in question. The map, which is part of the record on appeal, is based on a photographic enlargement of part of the "Sidwell," or official plat, of the Canterbury Heights subdivision. A diagram on the map represents the new residence. At Robert May's request, Zahn and his associates measured the part of the road that was asphalt pavement. This is marked on the diagram as "asphalt drive" and is part of the area described in the 1979 plat of dedication.

There is a broken line on the map running from the intersection of Hillandale Road with Hillshire Drive to just east of the curve in the road that creates the cul-de-sac that provided the site of the new residence. Zahn testified that when he visited the area in the autumn before the trial, the stretch of road represented by the dotted line was being used for a driveway even though the ground surface had not been paved. Other than as Zahn specified, Hillandale Road was neither paved nor being used as a road. Although mentioned in the plat of dedication, the "road" was primarily an open, grassy area with a few iron stakes that marked the northern and western limits of the lot with the May residence (and thus the southern boundary of the allegedly dedicated roadway). Zahn did not know when or by whom the stakes had been installed.

Roxanne Schutes, land trust administrator for Amcore Bank, which owned the property in issue from 1987 to 1989, testified that, at plaintiffs' request, she examined three trust agreement files that originated with Amcore's predecessor in interest. Only one trust agreement had been subject to a collateral assignment. Arnold May was the sole beneficial owner and sole owner of the power of direction of the corpus of each trust.

Plaintiffs next called Suzanne Ehardt, director of the McHenry County department of planning and zoning and acting zoning enforcement officer. Ehardt identified a number of exhibits, including six letters sent between February 1, 1988, and March 11, 1988. These letters went between Ehardt and the attorney for a party interested in purchasing the property now constituting the seventh addition to the Canterbury Heights development. The attorney requested cancellation of any plans to build the Hillandale Road extension. To Ehardt's knowledge, nobody in her office notified the township highway commissioner of this correspondence; there was never any question that the dedication and the improvement of the extension would be prereq-

uisites to the county's final approval of a subdivision proposal for the seventh addition.

Ehardt stated that the planning and zoning department approved the original plat of dedication without requiring a title report about the property in issue. At the time that the plat of dedication was filed, the only requirements were that the person with the right to subdivide the property sign the owner's certification and have it notarized.

Plaintiffs then called Richard Amundsen, a title underwriter for the Chicago Title Insurance Company, which, on March 31, 1989, issued a commitment for the property to the new owner, Amcore. In August 1989, at Amcore's request, Amundsen conducted a title search of the land specifically within the arch of Hillandale Road (where the May residence was constructed). The title search revealed, *inter alia*, that in December 1967 Arnold May conveyed the property to First National Bank of Woodstock as land trustee, and that, in December 1987, after a series of intervening transactions, Amcore obtained title to the property through a sheriff's foreclosure. Eventually, title passed to First Illinois as trustee; First Illinois held title at the time of the title search. Amundsen determined from examining the chain of title that, to a reasonable degree of certainty, neither May Development nor Robert May had ever been in the chain of title for the property at issue. Thus, in August 1989, Amundsen expressed concern that May Development did not own the property that it had purported to dedicate via the 1979 plat of dedication. Rather, the title search indicated that in both August and October 1979 First National Bank of Woodstock was the record owner of the property purportedly dedicated via the plat.

Plaintiffs called Walter Valentine as an adverse witness. Valentine had been township highway commissioner since 1978. Valentine stated that he found out only very recently that in 1988 the county waived the requirement that the purchasers of the seventh addition install and improve the Hillandale Road extension. Valentine himself never met or had contact with the prospective buyer.

Robert May testified that he resided at the "May Residence" depicted on Zahn's map. In 1958, when Robert May was a child, May Development was incorporated by his father, Arnold May. Robert May did not become president of May Development until 1973, about five years after Arnold May had distributed May Development's stock to Robert and Robert's sisters. May Development develops and sells vacant residential lots.

Robert May was long familiar with the Canterbury Heights subdivision. Beginning late in the 1950s, Arnold May brought land into development for the subdivision by removing that land from his 1,000-acre farm. Generally, Arnold May held title to the property through a trust; he decided what property would be developed in what manner. Arnold May prepared the plat of subdivision for the fourth addition although Robert May as president of May Development signed the plat.

Robert May recounted how the sixth addition became part of the subdivision. Arnold May developed the property and sold it through a brokerage Robert May ran. May Development built no homes for sale on the addition. May Development did not sell all the lots in the sixth addition until sometime in 1990.

Arnold May also decided to develop what became the seventh addition. He transferred 55 acres on which he had resided to May Development, which issued him a note in return and developed the property. The development was still incomplete when the 55-acre "farm" was subject to a foreclosure. Late in 1987, Robert May found out that the farm was for sale. In 1988, Robert May signed a contract to purchase the farm. The actual purchase was made by First Illinois as trustee for Nippersink, the corporation that Robert May owned. Nippersink, not May personally, owned the "farm." Robert May insisted as a condition of the purchase that the Hillandale Road extension be vacated.

At the time of the purchase, Robert May was under the impression that the extension was a valid township easement. He was aware that Amcore, through attorney Thomas Zanck, had requested that the supposed dedication be vacated. Although Zanck notified May that Amcore's petition for vacation had been denied, Nippersink bought the property anyway. Neither May nor anyone else appealed Valentine's decision to deny the petition for vacation. Robert May took possession of the "farm" in 1989 and, after securing a building permit in 1990, started building his residence on the property in May 1991. At the request of the building and zoning committee, May submitted a plat of survey that Zahn's office had prepared. As was standard, the construction company at work on May's residence applied for the permit. No land had been sold out of the farm since 1988.

Robert May acknowledged that he signed the plat of dedication that indicated incorrectly that May Development owned all of the land involved. At the time Robert May signed the plat, he intended that May Development dedicate the Hillandale Road extension to the township. Arnold May had handled the negotiations with Valentine, but

Robert May was aware of the negotiations. He was informed at that time (1979) that Valentine insisted on the dedication as a condition of the approval of the plat for the seventh addition. It was only in June 1991 that May learned that May Development did not own part of Hillandale Road. As it turned out, there was a sliver of property that had remained in one of Arnold May's trusts. Thus, in signing the original plat of dedication, Robert May had committed May Development to conveying property that May Development did not own.

After Zanck's petition for vacation was denied, Robert May (working under the assumption that the township had a valid interest in the Hillandale Road extension) realized that possibly the township could put in a road along the extension. He did not believe that the road would ever go in. As of 1988, only about half of the seventh addition had been developed.

After starting the construction of the May residence, Robert May used part of the Hillandale Road extension so that he could get to his residence. In the 13 years between the filing of the plat of dedication and Robert May's use of the roadway, the public never used the Hillandale Road extension. The land was being farmed, primarily in corn, and had also been used for a hunt club in the last two years. The alleged easement had become overgrown with prairie grass.

Charlan Crippen of the engineering firm of Vargas & Associates (Vargas) testified that in November 1987 a client of Vargas, Paul Ohadi, was interested in buying the seventh addition. On Ohadi's behalf, Vargas officials attended a November 18, 1987, meeting of the plat review committee of the county board and asked for a waiver of the requirement that the purchaser of the seventh addition improve the Hillandale Road extension. The committee told Vargas to contact Valentine.

In two meetings in November 1987, Valentine informed Crippen and another official of Vargas that, although he did not think the road was necessary, he would have to check with the superintendent of schools and the fire chief, as transportation in and out of the subdivision was a potential concern for these officials. Eventually, Valentine told Vargas that the school superintendent wanted the road installed. Vargas did not wish to pay to improve a road that would serve primarily the fourth and sixth additions. Eventually, Ohadi lost interest, and Crippen never found out whether the road, which she assumed had been properly dedicated, was ever vacated.

Commissioner Valentine testified for defendants. He stated that in 1978 he was familiar with the proposed seventh addition to the Canterbury Heights subdivision. He and James Rakow, the county super-

intendent of highways, worked to make the Hillandale Road extension dedication part of the development. They were motivated by considerations of safety, as the presence of a cul-de-sac made it difficult for fire fighting equipment to move in and out of the area. After meetings at which Arnold May was present the county demanded that prerequisites to the development of the seventh addition would include the deposit of a road bond and the dedication of the Hillandale Road extension. Thus, after the subdivision was developed, the extension would be accepted into the township road system. Before the approval of the seventh addition, the township approved the layout and proposed construction of the roads in the development.

Valentine signed the plat of dedication at issue in July 1979. He testified that he would not have supported the development of the seventh addition without the agreement to dedicate the Hillandale Road extension. As best he could recall, there were no meetings or discussions with regard to the platted dedication between 1979 and 1988. In 1988, Vargas called Valentine about the Hillandale extension. Valentine called the fire department and the school district, both of which objected to the idea of vacation of the extension. According to Valentine's testimony, he never told anyone from Vargas that he did not believe that the development of the extension was necessary. When Thomas Zanck advanced the petition to vacate the dedication, Valentine presided over a public hearing on the petition. The result of the hearing was that the petition to vacate was denied. No appeal was taken from this decision.

At trial, Valentine reiterated that he believed that the Hillandale Road extension was necessary to public safety. It would provide an outlet in case the only other road going into Hillandale Road became blocked, as had happened once three years before trial. The extension would serve more than the houses in the "arch" of the extension. It would make it possible for traffic to circulate rather than simply return the way it came. On cross-examination, Valentine admitted that there was only one way to enter any of the many cul-de-sacs in Canterbury Heights; in this respect, the safety problem was generic and not unique to the property in issue. Valentine stated that the problem was worse here than with other cul-de-sacs because the cul-de-sac here was relatively small. However, he did not know whether, as township road commissioner, he had the authority to require that the cul-de-sac be expanded to the size listed on the plat of subdivision for the fourth addition.

Valentine did not know whether the May residence was the only residence that would eventually be served by the road. Currently, the

May residence was the only one built in the arch. According to Valentine, Arnold May had said once that there would be four other houses in the arch. Valentine could not say whether this would become the case.

On cross-examination, Valentine admitted that the part of the Hillandale Road extension that was in the sixth addition had not been constructed or developed at all. There was nothing there but grass or "growed-up brush" which the owners of the adjoining lots had not been mowing. After Valentine learned in 1987 that, without his knowledge, the county had waived the development of the extension, he assumed that whoever developed the land would improve the road. He did not believe the township would do so, mainly because the township's budget and taxing abilities were limited. Concededly, this was a "discretionary decision" representing township priorities.

Although Valentine disapproved of the county's waiver of the development requirement, he did not bring the matter to the attention of the county and only complained verbally to a county zoning enforcement officer who may or may not have had the final say in the matter. However, he found out about the waiver only after work on the seventh addition began. He never asked the township road district's attorney whether he had any way to challenge the waiver.

On cross-examination, there occurred the following exchange between plaintiffs' counsel and Valentine:

"Q. Did you ever accept any portion of the Hillandale Drive Road extension that's shown on that Plat of Dedication, other than the acceptance you tried to make after this lawsuit got filed?

A. I thought it was accepted with the dedication.

Q. You thought it was.

A. Yes. When the road was dedicated, I thought it was accepted.

Q. What does it say on there? Does it say you approved it or accepted it?

A. I accepted, I believe.

Q. Did you get any legal opinion that merely by signing that Plat of Dedication that you accepted the roadway?

A. When I accepted—Unit 7 got the road when it was completed.

Q. I know.

How did you do that?

A. Because it was completed.

Q. After the road was completed, you accepted it, correct?

A. Right.

Q. The road wasn't ever completed here before this lawsuit was filed, was it?

A. No, it wasn't completed. It was dedicated.

Q. Correct.

So you never accepted that roadway until after this lawsuit, or any portion of it, until after this lawsuit was filed, correct?

A. No, I didn't.

\* \* \*

Q. Why didn't you accept it?

A. Because it was no road there.

\* \* \*

Q. If you once accepted that, could the people in these subdivisions force you to actually maintain that road and build it at that point, if you accepted it?

A. I have no idea. I never had that happen.

Q. Because you never accepted an unimproved roadway.

A. I never have, no."

Later in his testimony, Valentine stated that township road districts seldom build roads; customarily, they wait for the developers to build roads in subdivisions.

Defendants' next two witnesses were Richard Jacobson, head of the township fire protection district, and Constance Gradt, transportation director for the township high school. Both testified that the public would benefit from the development of the Hillandale Road extension, which would ease the problems created by the cul-de-sac. With the development of the extension, fire trucks and school buses could get into and out of the area more easily and reliably. However, Jacobson conceded that the fire department's problem with this cul-de-sac was the same as it had with all other cul-de-sacs, and Gradt stated that enlarging the cul-de-sac would ease bus traffic in the area.

Defendants next called Robert May. May stated that, when the plat of dedication was filed, the area that included the Hillandale Road extension and the "farm" (an area labeled "102" on Zahn's map) was actually held in a trust controlled by Arnold May. At the time Robert May signed the plat, his father was aware of the proposed dedication of the extension; when Arnold May told Robert May to sign the plat, Arnold May stated that he wished the property to be dedicated as a road. As of 1979, Arnold May was in charge of drawing up plats that contained what he and Robert May believed were the correct names on them.

Plaintiffs called several witnesses in rebuttal. Suzanne Ehardt testified that the "farm" (which extends both east and west of Hillandale Road) was presently zoned agricultural. This zoning classification allowed only one residence on the property unless the property was rezoned and platted anew under the subdivision review process. Furthermore, the land on the perimeter of the extension, although not the May residence, was on a floodplain, where residential construction was forbidden.

Thomas Zanck testified that, in 1988, his client Amcore owned the "farm" as the result of a foreclosure sale. On November 15, 1988, Zanck spoke with Valentine. He told Valentine that Amcore was interested in selling the property to someone named Bower and that Zanck would be petitioning to vacate the road extension. Valentine stated that he had no problem with the petition, but he later told Zanck that the fire protection district and the school district would object to the petition. Zanck informed Valentine that neither Amcore nor any other party was going to put in a road.

McHenry County engineer James Rakow, whose duties included exercising general control of the county highway system, testified that in October 1991 Valentine requested Rakow's permission to accept 125 feet of Hillandale Road that had been developed after the present lawsuit was filed. Rakow's department never received any similar request regarding any of the Hillandale Road extension other than this 125-foot stretch. Only after October 1991 did Rakow inform Valentine that the township did not need Rakow's authorization to make such acceptances.

Michael May, vice-president of the excavating contractor that worked on the construction of the 125-foot stretch, estimated that it would cost about $13,900 to enlarge the Hillandale Road cul-de-sac to its platted size. The estimated cost of developing the Hillandale Road extension from the northern boundary of the fourth addition to the beginning of the sixth addition was about $100 per lineal foot. From the Zahn map, it appears that the distance involved in this development is well in excess of the 125 feet already developed.

At the close of the evidence, defendants' attorney requested that the court take judicial notice that the county had exempted the property in question from taxation since 1979. The parties agreed that any tax revenue foregone was slight. The court stated that it would accept a certificate of exemption as evidence on the condition that defendants' attorney find out how much revenue was involved. There is nothing in the record showing that defendants' attorney supplied

this information or that the certificate of exemption was admitted into evidence.

The trial court ruled in favor of plaintiffs. The court's written order held that (1) the attempted statutory dedication was void from the beginning because May Development, which signed the plat, did not own the property; and (2) that "even if the dedication were construed as a common law dedication, [defendants] slept on their rights" and the equities of the case were with plaintiffs. The court ordered the county recorder of deeds to cancel the plat of dedication. The court declared that title to the real estate in issue was quieted in First Illinois, free of any claim by defendants. Defendant Walter Valentine timely appealed this order.

On appeal, Valentine concedes that there was no valid statutory dedication of the Hillandale Road extension. However, he maintains that the trial court's finding that there was no common-law dedication was against the manifest weight of the evidence. Plaintiffs argue that the trial court properly found that although the owner of the property intended such a dedication in 1979, plaintiffs properly revoked the offer of dedication in 1992 because the township never accepted the offer in the intervening period. We hold that the plaintiffs' argument, which the trial court accepted, is supported by the evidence.

■■ ■ A private party may make either a statutory or common-law dedication of property to a municipality or other public entity. A statutory dedication is created by a particular form of the instrument recorded (see 765 ILCS 205/3 (West 1992)), while a common-law dedication may be made by a written instrument or may be evidenced by acts and declarations without a writing. (*Terwelp v. Sass* (1982), 111 Ill. App. 3d 133, 136.) A statutory dedication is not valid unless there has been strict compliance with the statute. (*Reiman v. Kale* (1980), 83 Ill. App. 3d 773, 776.) The parties agree there was no valid statutory dedication here, as the plat of dedication was not signed by Arnold May, the owner of the relevant property at the time the plat was signed and filed. (See *Kuney v. Zoning Board of Appeals* (1987), 162 Ill. App. 3d 854, 857-58.) The issue remains whether there was nonetheless a valid common-law dedication.

■■ For a common-law dedication to be effective, there must be (1) an intention to dedicate the property to public use; (2) acceptance by the public; and (3) unequivocal evidence of the first two elements. (*Rose v. Village of Elizabethtown* (1916), 275 Ill. 167, 176-77; *Kuney*, 162 Ill. App. 3d at 859.) On appeal, plaintiffs do not dispute that there was evidence of the owner's donative intent. The testimony of Robert May and the circumstances of the filing of the plat of dedication pro-

vide sufficient evidence that Arnold May, the actual owner of the property, intended that the Hillandale Road extension be donated to the township. The sole issue left is whether the trial court erred in refusing to find that there was unequivocal evidence that the public accepted the dedication. If there was no acceptance, plaintiffs had the right to revoke the offer of dedication and did so by building on the property and by bringing this suit. See *Nimpfer v. Village of Fox Lake* (1929), 334 Ill. 46, 50; *Village of Vermont v. Miller* (1896), 161 Ill. 210, 215.

■ A municipality is not obligated to accept property simply because a private party has attempted to dedicate that property. (*Warzynski v. Village of Dolton* (1975), 61 Ill. 2d 475, 480.) Thus, whatever defendant's subjective understanding at the time, the mere filing of the plat of dedication did not amount to a completed common-law dedication. Rather, the filing of a defective plat is at most an offer of dedication. (*Rose*, 275 Ill. at 177; *Schwebl v. Seifer* (1991), 208 Ill. App. 3d 176, 179; *La Salle National Bank v. City of Chicago* (1974), 19 Ill. App. 3d 883, 886.) Therefore, we must determine whether the township road district accepted this offer.

Acceptance *may* be proved by evidence of (1) direct municipal action, such as the municipality's filing of a suit to establish a dedication (*Reiman*, 83 Ill. App. 3d at 776-77); (2) the municipality's possession or maintenance of the property (*McCue v. Berge* (1944), 385 Ill. 292, 301); or (3) public use of the road for a substantial time (*H.A. Hillmer Co. v. Behr* (1914), 264 Ill. 568, 578; *Village of Joppa v. Chicago & Eastern Illinois R.R. Co.* (1977), 51 Ill. App. 3d 674, 680-81). However, whether any of these factors actually proves acceptance depends on the facts of each case. *Behr*, 264 Ill. at 578.

■ Here the trial court properly concluded that the township did not prove by unequivocal evidence that it timely accepted the intended dedication. Indeed, defendant's own testimony, as quoted at some length above, is itself equivocal. Defendant acknowledged that the township did not wish to assume the burden of improving the property in question or any similar property. Defendant himself testified that he did not accept dedicated roadways until the owners had made the needed improvements. With such unclear testimony from the defendant, the trial court could conclude that there was no unequivocal evidence that the township had accepted the dedication (and the concomitant burden to make any improvements on the property it owned). The township road supervisor's unexpressed subjective *belief* that he had accepted the dedication did not communicate anything to the owners of the property and was not equivalent to an acceptance.

Furthermore, the defendant has never denied that, from the time of the plat of dedication until the present suit, the "road" remained completely unimproved and had become overgrown with vegetation. The township performed no maintenance on the roadway, and there is no evidence that the public used this unimproved farmland for a public roadway. Courts have refused to find acceptance even where the public has made some use of the property. (See, *e.g.*, *Warzynski*, 61 Ill. 2d at 478-80 (infrequent public use of the property as a shortcut insufficient to show use); *Rose*, 275 Ill. at 178 (mere travel is not sufficient to show acceptance by the public).) Here it appears that neither the municipality nor the public made any use of the supposed roadway for over a decade.

Defendant reminds us that "[w]here a dedication is very beneficial or greatly convenient or necessary to the public, an acceptance may be implied from slight circumstances." (*McCue*, 385 Ill. at 299-300; see *Joppa*, 51 Ill. App. 3d at 679.) We do not quarrel with this general principle, but we do not find it persuasive in this particular case. Given the lack of any maintenance or public use of the property for over a decade, it is doubtful whether the trial judge was required to find even the "slight circumstances" to which *McCue* alludes.

Equally importantly, the township's actions (or lack of same) undercut its belated assertion that developing the extension is a matter of great public necessity. Defendants produced some evidence at trial that fire protection and school transportation might benefit from the completed development of the extension. However, we are entitled to ask why, if this public necessity was so great, the township did nothing to meet it in the long period during which all the parties concerned believed that the township had the authority to take such action. The trial court was entitled to ask the same question and to conclude that defendants gave no convincing answer. The trial court could also consider that (apparently) even the school and fire districts voiced concern about the extension only when private parties threatened to petition to vacate the alleged dedication.

Although defendant argues that the trial court improperly applied the doctrine of *laches* to this case, we agree with plaintiffs that the statement that the township "slept on [its] rights" simply expresses a finding of fact that the township did not accept the dedication prior to the plaintiffs' revocation. We shall not overturn the trial court's factual findings unless they are against the manifest weight of the evidence. (*Glenview State Bank v. Village of Deerfield* (1991), 213 Ill. App. 3d 747, 759.) The finding that there was no valid common-law dedication is not against the manifest weight of the evidence.

Defendant argues that the failure of Arnold May (and of plaintiffs) to ascertain the correct owner of the Hillandale Road extension would result in a constructive fraud upon the township unless the township is adjudged to possess its claimed interest in the Hillandale Road extension. Citing *Beaton & Associates, Ltd. v. Joslyn Manufacturing & Supply Co.* (1987), 159 Ill. App. 3d 834, 843-44, defendant reasons that, even though nobody intended any deception in filing the defective plat, allowing plaintiffs to benefit from the carelessness of May Development would work an unfair hardship upon the public.

We conclude that the trial court's implicit finding that there was no constructive fraud is not against the manifest weight of the evidence. A showing of constructive fraud requires proof that plaintiffs breached a legal or equitable duty and that in doing so they tended to deceive others. (*Joslyn*, 159 Ill. App. 3d at 844.) Assuming that Robert May's failure to ascertain the proper ownership of the parcel may be imputed to plaintiffs, we do not believe that the trial court was required to find that this amounted to constructive fraud. Defendant does identify or suggest what duty to him was breached. In *Joslyn* and in cases relying on its discussion of constructive fraud, the courts emphasized that the constructive fraud-feasor stood in a fiduciary relationship to the party defrauded or benefited from another's breach of a fiduciary duty to the victimized party. (*Joslyn*, 159 Ill. App. 3d at 843; see also *In re Gerard* (1989), 132 Ill. 2d 507, 528-29; *Vermeil v. Jefferson Trust & Savings Bank* (1988), 176 Ill. App. 3d 556, 564.) Here defendant offers no argument to establish that May Development owed the township a duty, fiduciary or otherwise. We note further that information as to the true ownership of the property was a matter of public record, as accessible to township officials as to other parties.

Finally, we reject defendant's assertion that plaintiffs are equitably estopped to deny that there was a valid dedication. To demonstrate an equitable estoppel, a party must show that it reasonably relied to its detriment on the misleading conduct of the other party. (*Vaughn v. Speaker* (1988), 126 Ill. 2d 150, 161-62.) Defendant asserts that, in reliance on the erroneous plat of dedication, it withdrew the property at issue from taxation and was forced to defend the present suit. We agree with plaintiffs that the trial court rightly found that such "prejudice" was inadequate to create an estoppel.

The trial court stated that it would consider the matter of the tax exemption only if counsel for defendant submitted evidence of the amounts involved; as far as the record indicates, counsel never submitted this information. Moreover, defendant admitted that the

amount of tax revenue involved was minimal. Defendant cites no authority for his novel assertion that the township was prejudiced because *plaintiffs* were required to file a suit to clear title to the property. The township could have avoided this "prejudice" by suing to enforce the dedication; such a suit would have constituted the acceptance necessary to a valid common-law dedication. See *Reiman v. Kale* (1980), 83 Ill. App. 3d 773, 776-77.

The evidence demonstrates that for over a decade the township took no action to develop the property. In light of this deliberate inaction, we cannot say that defendant proved either reasonable reliance on misrepresentations by plaintiffs (or by any other parties) or prejudice therefrom.

The trial court did not err in holding that there was neither a statutory dedication nor a common-law dedication of the Hillandale Road extension. Therefore, the judgment of the circuit court of McHenry County is affirmed.

Affirmed.

BOWMAN and QUETSCH, JJ., concur.